**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Jessica Irving,

      **Plaintiff,**                :        **Case No. 2:16-cv-728**

      **v.**                        **Judge Sarah D. Morrison**
                                        **Magistrate Judge Kimberly A. Jolson**

Steve Carr, *et al*.,            :

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants' Combined Motion for Judgment on the Pleadings and Motion for Summary Judgment. (ECF No. 52.) Plaintiff filed a Memorandum in Opposition to the Combined Motions (ECF No. 61) and Defendants filed a Reply (ECF No. 64). On the Court's suggestion, Defendants later supplemented their Combined Motions (ECF No. 79), Plaintiff supplemented her Memorandum in Opposition (ECF No. 80), and Defendants filed a Reply (ECF No. 84). These matters are now ripe for consideration.

## I. FACTUAL BACKGROUND

This action was filed on July 26, 2016, by Plaintiff Jessica Irving. (Compl., ECF No. 1.) Ms. Irving brings six claims against the Board of Education of the Southwestern City School District (the "District") and seven individual defendants (the "Individual Defendants"), all of whom are employed by the District but who have been sued in their individual capacities. (*Id.*)

Ms. Irving is an African-American woman who was employed by the District as a Speech-Language Pathologist ("SLP"). She began working full-time in this position at the beginning of the 2010–11 school year. (Steven Carr Dep. 21:9–22:8, ECF No. 45-1.) In that first year, Ms. Irving was assigned to three schools—Monterey Elementary School ("Monterey"),

Brook Park Middle School ("Brook Park"), and Southwestern City Preschool—and she was responsible for approximately 35–50 students. (Jessica Irving Dep. 22:16–23:12, ECF No. 46-1.) For the next two school years, Ms. Irving was assigned to Monterey, Brook Park, and a private Christian school, and she was responsible for approximately 30–42 students. (*Id.* at 29:9–17, 30:5–20.) Ms. Irving's supervisor was the Director of Special Education, a position that was held during this time period first by Defendant Steve Carr and then by Gwenn Spence. (*Id.* at 29:21–22, 30:5–10, 37:1–9; Carr Dep. 8:1–23.)

For the 2013–14 school year, Ms. Irving was transferred, at her request, to Darby Woods Elementary School ("Darby Woods"). (Irving Dep. 37:1–6, 46:2–14.) She had requested this transfer because it was only one school and because it was more convenient to her home. (*Id.* at 42:22–24.) After this transfer, Ms. Irving began to work with Darby Woods' principal, Debbie Reed; the school psychologist, Joanne Greenwald; and the occupational therapist, Amy Watson Grace. (*Id.* at 38:22–40:15, 41:15–24.) During the 2013–14 and 2014–15 school years, Ms. Irving was responsible for approximately 30–50 students at Darby Woods. (*Id.* at 38:4–6, 74:23–75:5.)

After beginning work at Darby Woods, Ms. Irving became concerned that some of her colleagues, including Ms. Watson Grace, were pushing her to "overqualify" students for delivery of special education services, including speech therapies. (*Id.* at 52:17–23, errata.) Qualifying more students had the potential to increase the amount of Medicare payments to the District. (*Id.* at 33:18–35:3.) Ms. Irving began reporting these concerns to Ms. Spence in December 2013. (*Id.* at 52:9–23, errata; Gwenn Spence Dep. Ex. 14, ECF No. 41-1, at 37.) It does not appear, however, that Ms. Spence shared these concerns with anyone else in the District. (Spence Dep. 54:12–55:18.)

On April 9, 2015, Ms. Irving met with Mr. Carr, who told her that he was "considering" reassigning her away from Darby Woods for the following school year because Principal Reed did not consider her to be a team player. (Irving Dep. 58:6–24; Carr Dep. 176:8–16.) Mr. Carr asked Ms. Irving to consider an alternative placement in the event that she did not stay at Darby Woods. (Carr Dep. 176:8–16.) According to Ms. Irving's recollection, Mr. Carr specifically told her that she was the only staff member who was being moved away from Darby Woods. (Irving Dep. 67:11–68:3.)

At this meeting, Ms. Irving expressed various concerns to Mr. Carr. She told him about her concerns about overqualification. (*Id.* at 59:5–9.) She also expressed that she felt like she was being treated differently because she was a minority. (*Id.*) Specifically, she told him that her coworkers "weren't ready to deal with a person of [her] skin color," that they did not see her as a professional, and that they treated her as if she were beneath them. (*Id.* at 60:8–16.)

On May 14, 2015, Ms. Irving and her union representative, Beth Edgington, met with Principal Reed. (*Id.* at 64:5–13, 69:23–70:6.) At this meeting, Principal Reed denied saying that Ms. Irving was not a team player and said that it was Defendant Deborah Carpenter who had said that to Mr. Carr. (*Id.* at 70:9–23.) Ms. Carpenter was the Special Education Coordinator for the District's elementary and intermediate schools. (Deborah Carpenter Dep., 7:6–9:3, ECF No. 42-1.) Principal Reed said that Mr. Carr and Ms. Carpenter had made the decision to transfer Ms. Irving. (Irving Dep. 70:23–71:1.)

On May 18, 2015, Mr. Carr, Ms. Irving, and Ms. Edgington met. (Beth Edgington Decl. ¶ 10, ECF No. 56-2.). At this meeting, Mr. Carr reiterated that Principal Reed had said that Ms. Irving was not a team player. (Irving Dep. 64:1–65:10.) This time, Mr. Carr told Ms. Irving that Ms. Watson Grace and Ms. Greenwald, both Caucasian, were also being transferred. (*Id.* at

66:21–67:7, 68:16–19.) Mr. Carr asked Ms. Irving if she wanted to be transferred to another school, and she said that she wanted to stay at Darby Woods. (*Id.* at 68:20–69:5.) At this meeting, Ms. Irving again expressed that she felt like she was being treated differently because of her skin color. (Edgington Decl. ¶ 14.)

The District sent Ms. Irving two conflicting letters, both dated May 28, 2015, both entitled "Notice of Tentative Assignment and Salary Certificated Personnel." (Carl Metzger Dep. Exs. 81–82, ECF No. 58-2, at 7–8.) One notified Ms. Irving that she would be continuing at Darby Woods. (*Id.* at Ex. 81.) The other notified Ms. Irving that she was being reassigned to Park Street Intermediate School ("Park"). (*Id.* at Ex. 82.) Ms. Irving received the second letter approximately two or three weeks after receiving the first. (Irving Dep. 72:13–21.) These letters were generated based on information from the Director of Special Education. (Metzger Dep. 48:15–49:2.)

On June 6, 2015, Ms. Irving filed a complaint with the Ohio Civil Rights Commission ("OCRC"), alleging racial discrimination. (Irving Dep. Ex. 6., ECF No. 46-1, at 81–84.) Specifically, Ms. Irving alleged that Principal Reed had treated her differently from other, Caucasian employees by, for example, demanding that she (and only she) place her schedule on a Google calendar, denying her a room change request, encouraging aides not to cover teachers' classrooms when she had meetings with the teachers, and chiding her for keeping her door closed. (*Id.*; *id.* at 122:6–123:19, 147:3–10.) Ms. Irving also mentioned her overqualification concerns in this complaint, alleging that she "was requested to use other testing tools or state a student [was] disabled when they were not." (*Id.* at Ex. 6, at 2.) The District was notified of this complaint after it was filed. (Metzger Dep. 56:4–20.)

Later that summer, Ms. Irving learned that she had been reassigned to Park, Franklin Woods Intermediate School ("Franklin Woods"), and Hayes Intermediate School ("Hayes"). (*Id.* at 73:2–13.) No SLP had previously been assigned these three schools at the same time. (Carr Dep. 207:19–24.) No SLP was assigned to these same three schools during the 2016–17 or 2017–18 school years either. (Jennifer Knapp Dep. 119:13–23, ECF No. 44-1.) Mr. Carr and his successor, Defendant Nicole Tyo, were in charge of Ms. Irving's final assignment. (Edgington Decl. ¶ 18.) After this reassignment, Ms. Irving was responsible for approximately 50–60 students at Park, 25–30 at Hayes, and 30–40 at Franklin. (Irving Dep. 77:4–11.) The maximum caseload under Ohio Department of Education ("ODE") regulations is 80 students. (Nicole Tyo Dep. 80:1–7, ECF No. 50-1.)

The District used a software program, Infinite Campus, that tracks the number of students assigned to each SLP. (Carr Dep. 76:18–77:8.) The number of students reflected on the Infinite Campus reports for Ms. Irving, while high, are lower than Ms. Irving's estimates from her deposition. This discrepancy may be due to fluctuations resulting from students being moved in and out of speech therapy, including students who were still being evaluated and had not yet been assigned to therapy. (*Id.* at 77:9–78:1.)

According to the 2015–16 Infinite Campus report, Ms. Irving had the largest caseload out of all full-time SLPs in the District. (Irving Decl. ¶ 2, ECF No. 59-1; Tyo Dep. Ex. 108, ECF No. 51-1, at 129.) As of September 1, 2015, Ms. Irving was assigned 85 students. (Tyo Dep. Ex. 108.) This number dropped to 69 three days later but rose back to 75 four days after that. (*Id.*) There were only six days during September and October when Ms. Irving was assigned fewer than 75 students. (*Id.*) As of September 30, 2015, Ms. Irving was assigned 82 students, and her

caseload never dropped any lower until after she went on medical leave on October 28, 2015. (*Id.*; Irving Dep. Ex. 2, ECF No. 46-1, at 61.)

In contrast, none of the other seven full-time SLPs in the District ever had a caseload above 65 students until Ms. Irving went on medical leave, and even after October 28, none had a caseload of more than 68. (Tyo Dep. Ex. 108.). Four of these seven SLPs never had a caseload of more than 50, even after Ms. Irving went on medical leave. (*Id.*)

In addition to having the heftiest quantity, the Infinite Campus reports also reveal that Ms. Irving's caseload was qualitatively the most difficult. It is more challenging and time-consuming for an SLP to have a case where she is designated as a "service provider" as opposed to a "case manager." (Irving Decl. ¶ 6.) This is because the students for whom an SLP is a "service provider" have multiple disabilities and are working with other professionals. (*Id.*) As of September 30, 2015, out of the 27 SLPs listed on the Infinite Campus "Speech Therapist Daily Count," Ms. Irving had both the highest total number of students (82) and the highest number for whom she was the service provider (63). (ECF No. 59-3, at 2.) The SLP with the second highest total (55) had eight fewer total students than those for whom Ms. Irving was designated as the service provider. (*Id.*) Twenty-three of these 27 SLPs had 50 or fewer total students. (*Id.*)

The same remained true for October. As of October 30, 2015, Ms. Irving was assigned 83 students and was the service provider for 65. (*Id.* at 3.) Ms. Irving's service provider total continued to be higher than anyone else's total number of students, and 24 of the 28 listed SLPs were assigned 50 or fewer total students. (*Id.*)

Around August 27, 2015, Ms. Irving complained to Ms. Tyo that her Infinite Campus caseload was too high at 90 students. (Irving Dep. 77:4–78:18.) On September 15, 2015, Ms. Irving had a meeting about her caseload with Defendant Jennifer Bogenrife, the Special

Education Coordinator for the District's middle and high schools. (Irving Dep. 92:9–94:24; Jennifer Bogenrife Dep. 5:24–6:3, ECF No. 47-1.) After this meeting, Ms. Irving continued to have an excessive caseload. (Irving Dep. 99:20–100:2; ECF No. 59-3, at 2–3.)

In September 2015, Ms. Irving contacted the Ohio Board of Speech-Language Pathology and Audiology (OBSLPA) regarding her excessive caseload. (Tyo Dep. Ex. 28, ECF No. 51-1, at 1.) Around September 23, 2015, Ms. Irving received a letter from the OBSLPA, which she gave to Ms. Tyo and Ms. Bogenrife. (*Id.*; Bogenrife Dep. 62:6–22; Tyo Dep. 66:3–22.)

On September 24, 2015, Ms. Bogenrife provided Ms. Irving with a Letter of Direction, outlining alleged issues with Ms. Irving's performance and corrections that she was required to make. (ECF No. 46-1, at 58–59; Irving Dep. 100:3–7.) Among other things, the letter alleges that Ms. Irving had not been servicing her students. (ECF No. 46-1, at 58–59.) Ms. Irving disputes this allegation, as well as most of the rest of the letter's contents. (Irving Dep. 101:13–107:2.)

On October 28, 2015, Ms. Irving went on medical leave after her doctor concluded that the stress of Ms. Irving's job was negatively impacting her health. (*Id.* at 112:19–113:8, *id.* at Ex. 2.)

On November 2, 2015, Defendant Carl Metzger, the District's Assistant Superintendent in charge of personnel, asked Defendant Amber Hufford, the District Civil Rights Officer, to initiate an investigation into whether Ms. Irving was properly performing her duties. (Amber Hufford Dep. 12:18–23, 23:17–24:2, 65:8–10, ECF No. 48-1; Hufford Dep. Ex. 95, ECF No. 49-1, at 80–94) The purpose of the investigation was to determine whether the Letter of Direction had been appropriately issued and whether Ms. Irving was in compliance with the outlined directives. (Hufford Dep. Ex. 95, at 1; Metzger Dep. 122:14–123:15.) Ms. Hufford completed her report in December 2015 and provided her report to the District. (Hufford Dep. 10:20–

11:11.) This report concluded that the Letter of Direction was justified and that Ms. Irving had not followed all of the directives issued to her in this letter. (Hufford Dep. Ex. 95, at 12.) The report also found discrepancies in Ms. Irving's Medicaid billing, including billings for services for students who were absent or tardy on the day billed. (*Id.* at 13.)

On January 20, 2016, Ms. Irving resigned from the District, claiming that her resignation was involuntary and that she felt forced to resign based on the workload she had been assigned, the environment in which she had been working, and the harassment and discipline she had received in response to her requests for help. (Irving Dep. Ex. 11, ECF No. 46-1, at 96.) On January 21, 2016, the District accepted Ms. Irving's resignation. (*Id.* at Ex. 12, ECF No. 46-1, at 100.)

On January 27, 2016, Dr. Metzger submitted a "School District, DD Board & Community School Educator Misconduct Reporting Form" (the "Misconduct Form") to the ODE, reporting that Ms. Irving had resigned while under investigation, as well as providing a summary of the information that the investigation had uncovered. (Metzger Dep. Ex. 85, ECF No. 58-4.) Dr. Metzger submitted this report because he was advised that it was mandatory under the circumstances. (Metzger Dep. 50:4–52:17.) Ms. Irving subsequently received a letter from the ODE informing her that she was under investigation and that her license was in jeopardy. (Irving Dep. 135:1–3.)

Ms. Irving has brought the following claims against the Individual Defendants: Claim One – First Amendment retaliation; Claim Two – racial discrimination and retaliation pursuant to §§ 1981–1983 and the Equal Protection Clause; and Claim Three – post-termination First Amendment retaliation. As to the District, Ms. Irving alleges race discrimination (Claim Four), "retaliation" (Claim Five), and post-termination retaliation (Claim Six).

## II.    DISCUSSION

### A.    Lack of Subject Matter Jurisdiction

"[A] district court may, at any time, *sua sponte* dismiss a complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure when the allegations of a complaint are totally implausible, attenuated, unsubstantial, frivolous, devoid of merit, or no longer open to discussion." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999). A plaintiff is not entitled to notice and opportunity to amend her complaint when the court considers a dismissal under this portion of the rule. *Id.*

In Claim Two, Plaintiff asserts that she brings a claim for "race retaliation" under § 1981 and the Equal Protection Clause of the Fourteenth Amendment, both also via § 1983. (ECF No. 1, ¶¶ 55, 57.) The Court *sua sponte* **DISMISSES** Plaintiff's § 1983 retaliation claims premised on the Equal Protection Clause because "a 'retaliation claim does not . . . arise under the Equal Protection Clause.'" *Smith v. City of Inkster*, 644 F. App'x 602, 611 (6th Cir. 2016) (alteration in original) (quoting *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 440 (6th Cir.2005)); *Barry v. O'Grady*, No. 2:14-cv-2693, 2017 WL 1234048, at *18–19 (S.D. Ohio Mar. 31, 2017).

### B.    Motion for Judgment on the Pleadings

#### 1.    Standard of Review

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) attacks the sufficiency of the pleadings and is reviewed under the same standard applicable to a motion to dismiss under Rule 12(b)(6). *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008). A claim survives a motion to dismiss pursuant to Rule 12(b)(6) if it "contain[s] sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). A

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level, on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)." *Twombly*, 550 U.S. at 555–56 (footnote and citations omitted).

A court must "construe the complaint in the light most favorable to the plaintiff." *Inge v.

Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). However, a plaintiff must provide "more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do . . . ." *Twombly*, 550 U.S. at 555; *accord Iqbal*, 556 U.S. at 678 ("Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

"[A] naked assertion . . . gets the complaint close to stating a claim, but without some further

factual enhancement it stops short of the line between possibility and plausibility . . . ." *Twombly*,

550 U.S. at 557. Thus, "something beyond the mere possibility of [relief] must be alleged . . . ."

*Id.* at 557–58.

### 2.    Analysis

Defendants move for judgment on the pleadings with respect to Plaintiffs' second, fourth,

fifth, and sixth claims. (Def. Mot. J. Pleadings, ECF No. 52, at 10.) First, Defendants argue that

each of these claims is improperly brought pursuant to 42 U.S.C. § 1981. (*Id.*) Because "'the

express cause of action for damages created by § 1983 constitutes the exclusive federal remedy

for violation of the rights guaranteed in § 1981 by state governmental units,' no independent

cause of action against municipalities is created by § 1981(c)." *Arendale v. City of Memphis*, 519

F.3d 587, 598–99 (6th Cir. 2008) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). Accordingly, Ms. Irving cannot maintain a stand-alone claim against the District under § 1981.

Even suits for damages against state actors in their individual capacities alleging § 1981 violations must be brought via § 1983. *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) ("[Section] 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor acting in his individual capacity."). As a result, Ms. Irving also cannot maintain claims against the Individual Defendants pursuant to § 1981 alone, although she can do so via § 1983. *See Boxill v. O'Grady*, 935 F.3d 510, 519 (6th Cir. 2019).

Nevertheless, the Court declines to dismiss any of these claims on the grounds of failure to plead a claim under § 1983. Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346–47 (2014) (per curiam). The plaintiff need only inform the defendants of "the factual basis" of her complaint, and a defect in statutory citation is not fatal. *Id.* at 347. Ms. Irving has provided adequate notice to Defendants. Claim Two explicitly states that it is being brought pursuant to § 1983, and context indicates that Claims Four, Five, and Six are also being brought pursuant to § 1983, even though that statute is not specifically cited. Defendants have had sufficient notice as to the claims against them and the statutory basis for them.

Defendants next argue that Ms. Irving has failed to plead the existence of an unconstitutional policy and thus fails to state a claim for municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). (ECF No. 52, at 11.) This argument is well taken with respect to Ms. Irving's fourth, fifth, and sixth claims only.

Defendants' motion is not well taken with respect to Ms. Irving's second claim, which is brought against the Individual Defendants "in their individual capacities."[1] (ECF No. 1 ¶ 2.)

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. Rather, in order to prove liability, a plaintiff must prove that it was the entity's policy or custom that caused the constitutional injury. *Id.* This requirement exists in order "to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability . . . is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

It is true, however, that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* As a result, liability may be imposed where a government's authorized decisionmakers decide to take a particular course of action. *Id.* at 481.

Ms. Irving argues that Mr. Carr had final decisionmaking authority over Ms. Irving's assignment and that this is adequate for District liability under *Monell*. (Pl. Resp. to Mot. J. Pleadings, ECF No. 61, at 30.) Defendants are correct, however, that this allegation appears nowhere in the Complaint. (Def. Reply, ECF No. 64, at 4; *see generally* ECF No. 1.) As a result, Ms. Irving is not entitled to pursue this theory. *See Cousino v. Twp. of Marshall*, No. 17-1922, 2018 WL 3854027, at *2 (6th Cir. Mar. 6, 2018) ("Cousino's amended complaint failed to allege that an official policy or custom of the Township resulted in a violation of his constitutional rights, as is required to state a § 1983 claim for municipal liability."); *McVicker v. Hartfield*, No.

---

[1] Although Defendants move for judgment on the pleadings on a § 1983 Equal Protection claim against the District, citing Claim Two, (ECF No. 52, at 11), there is no such claim contained in Claim Two. Claim Two is brought against only the Individual Defendants, and they are sued only in their individual capacities. (*See* ECF No. 1 ¶¶ 2, 54–59.)

2:08-CV-1110, 2009 WL 2431257, at *12 (S.D. Ohio Aug. 6, 2009) ("The complaint is devoid of any allegations or facts indicating the existence of an official policy which caused any constitutional violation against the plaintiffs by any of the defendants . . . ."); *cf. Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) ("[T]o satisfy the Monell requirements a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." (internal quotation marks omitted)).

Accordingly, Defendants' motion for judgment on the pleadings as to Claims Four, Five, and Six is **GRANTED**.

### 3. Conclusion

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for judgment on the pleadings.

## C. Motion for Summary Judgment

### 1. Standard of Review

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a

genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). The Court must refrain from making credibility determinations or weighing the evidence. *Shreve v. Franklin Cty.*, 743 F.3d 126, 142 (6th Cir. 2014). The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

### 2. Analysis

Ms. Irving's remaining claims consist of First Amendment retaliation (Claims One and Three) and racial discrimination and racial retaliation (Claim Two). She has brought these claims against the seven Individual Defendants.

### a. William Wise

Defendants have made various arguments as to the legal and factual sufficiency of Ms. Irving's claims, although they have not argued why any of the Individual Defendants should be treated differently than any of the others. However, because some of Defendants' arguments are well taken as to some of the Individual Defendants, if not others, the Court has considered those same arguments in the context of each Individual Defendant.

Ms. Irving has sued Defendant William Wise, the Superintendent for the District. Dr. Wise is conspicuously missing from the factual background in this opinion, because Ms. Irving has failed to identify in her Complaint, or in her motion papers, any basis for liability on the part

of Dr. Wise. Rather, Dr. Wise is only mentioned in the Complaint in reference to his supervisory role as superintendent. (ECF No. 1 ¶¶ 2, 30, 51, 62.) Dr. Wise is not mentioned in Ms. Irving's motion papers at all. (*See generally* ECF Nos. 61, 80.) Section 1983 does not, however, "incorporate doctrines of vicarious liability," *Pembaur*, 475 U.S. at 479, so Dr. Wise cannot be liable under § 1983 for the acts of other District employees. As a result, Dr. Wise's motion for summary judgment is **GRANTED** in its entirety.

### b.    Claim Two

After dismissing the improperly pleaded aspects of Claim Two, what remains is Ms. Irving's race discrimination claim against the Individual Defendants (except Dr. Wise) in their individual capacities under § 1983 and the Equal Protection Clause and a retaliation claim under § 1981. Race discrimination claims brought pursuant to § 1983 "are governed by the legal framework used to analyze claims under Title VII . . . ." *Williams v. Zurz*, 503 F. App'x 367, 374 (6th Cir. 2012). The same standard applies to an Equal Protection Claim. *Deleon v. Kalamazoo Cty. Road Comm'n*, 739 F.3d 914, 917–18 (6th Cir. 2014). Similarly, retaliation claims under § 1981 are treated the same as those under Title VII. *Boxill*, 935 F.3d at 520.

In the absence of direct evidence of discrimination or retaliation, such claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this approach, a plaintiff must first establish a *prima facie* case of discrimination or retaliation. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53 (1981). Establishing a *prima facie* case creates a rebuttable presumption that the employer engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07 (1993).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 252–53. The burden is not onerous. An employer will satisfy its burden as long as it articulates a valid rationale for its decision. *Hartsel v. Keys,* 87 F.3d 795, 800 (6th Cir.1996). Then, if the employer meets this burden, the plaintiff may still prevail if she shows that the reasons offered by the defendant are a pretext for discrimination or retaliation. *Burdine,* 450 U.S. at 253. To prove pretext, the plaintiff must introduce admissible evidence to show "'that the proffered reason was not the true reason for the employment decision'" and instead that racial animus was the true motivation driving the employer's determination. *Hicks,* 509 U.S. at 508 (quoting *Burdine*, 450 U.S. at 256). Throughout the analysis, the ultimate burden of proof remains with the plaintiff. *Id.* at 511.

If the defendant presents a legitimate, non-discriminatory reason for the employment action, "a plaintiff will survive summary judgment only by raising a genuine issue of material fact as to whether the proffered reason is in fact a pretext for discrimination." *Walcott v. City of Cleveland,* 123 F. App'x 171, 176 (6th Cir. 2005). To establish pretext, the plaintiff must show that "the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision . . . or (3) was insufficient to warrant the decision . . . ." *Id.* "In every civil rights action it is the responsibility of the jury [to] determine whether the defendant's actions were invidious, pretextual, or improperly motivated." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 578 (6th Cir.2000).

### i. Discrimination Claim

"To establish a *prima facie* case of intentional discrimination, a plaintiff must show that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he

was otherwise qualified for the position, and (4) he was replaced by someone outside the protected class or treated differently than a similarly situated, non-protected employee." *Deleon*, 739 F.3d at 918.

Here, Defendants concede that Ms. Irving has established the first prong of her *prima facie* case in that she is African-American. (ECF No. 52, at 12–13.) They also do not dispute the third prong. (Carr Dep. 125:19–126:4.) They dispute, however, that Ms. Irving has presented a genuine issue of material fact regarding whether she suffered an adverse employment action or was treated differently than similarly situated, non-protected employees. Ms. Irving responds that she has raised a genuine issue of material fact because she suffered the following adverse employment actions: (1) she was reassigned to a less desirable position covering three intermediate schools; (2) she received a substantially—and disproportionately—increased workload; (3) she was subject to harassment that included criticism of her work, the issuance of the "Letter of Direction," and an investigation into her work; and (4) she was constructively discharged. (ECF No. 61, at 23–24, 29–30.)

To show an adverse employment action for a race discrimination claim, a plaintiff "must establish that he has suffered a 'materially adverse' change in the terms or conditions of employment because of the employer's actions." *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999). Examples of "Adverse actions" include "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc) (per curiam). Various courts have concluded that neither the mere "commencement of an investigation" nor "criticisms, accusations, threats, or 'bad mouthing' are . . . enough" to constitute an "adverse action." *Magley v. Wright*, No. 5:98-cv-012, 2001 WL 36126924, at *19 (W.D. Mich. Mar. 30, 2001) (collecting cases). The Sixth Circuit has

emphasized, however, that "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X*, 175 F.3d at 398.

First, Plaintiff argues that her reassignment from Darby Woods to the three intermediate schools constitutes an adverse employment action. "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or alteration of responsibilities." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461–62 (6th Cir. 2000) (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). "Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002). "When a reassignment rises to the level of a constructive discharge, however, the reassignment is an adverse employment action. For a transfer or reassignment to amount to a constructive discharge, its conditions must be objectively intolerable to a reasonable person." *Id.*

One factor in determining whether a constructive discharge has occurred is whether the position to which an individual has been reassigned is increased distance from the employee's home. *Id.* And commuting distance is a proper factor for a jury to consider in determining whether a reassignment constitutes an adverse employment action. *Keeton v. Flying J, Inc.*, 429 F.3d 259, 265(6th Cir. 2005).

The Sixth Circuit has also stated the following:

[O]ur Circuit has not foreclosed the possibility that a transfer not rising to the level of a constructive discharge might nonetheless constitute a tangible employment action. In those cases, the focus narrows to whether there are "other indices that might be unique to the particular situation" which could turn what would ordinarily not be an adverse employment action into one. At a minimum,

> the employee must be able to show a quantitative or qualitative change in the terms of the conditions of employment.

*Deleon*, 739 F.3d at 918 (internal citations omitted) (quoting *Hollins*, 188 F.3d at 662). Based on this standard, the *Deleon* court determined that the plaintiff's claim of employment discrimination could survive summary judgment where he had been transferred to a position where he was subjected to poor air quality, even where the plaintiff had originally requested the transfer. *Id.* at 919–21.

In the face of *Deleon*, other district courts in this Circuit have denied motions for summary judgment in the face of similarly "intolerable" (or even objectively less intolerable) conditions as those to which Ms. Irving alleges she was subjected. *See Hawkins v. Maury Cty. Bd. of Educ.*, No. 1:12-CV-184, 2015 WL 4546783, at *11–12 (M.D. Tenn. July 27, 2015) (denying defendant's motion for summary judgment where the "stigma or loss of professional esteem" of an involuntary transfer of a school teacher could have "render[ed] the involuntary transfer objectively intolerable to a reasonable person."); *Kea v. Donahoe*, 119 F. Supp. 3d 723, 738 (E.D. Mich. 2015) (denying defendant's motion for summary judgment based on "objectively intolerable" condition requiring plaintiff to return to his home office to eat lunch instead of being able to stop for lunch along his work route). Based on *Deleon*'s words of caution, Ms. Irving's reassignment cannot be viewed in isolation. It must be viewed in the context of all of the surrounding circumstances, including the significant changes to her workload.

In arguing that an increased workload cannot constitute an adverse employment action, Defendants point to only one Sixth Circuit case. In that case, the issue was more of a scheduling issue than a workload issue where the plaintiff was denied the right to exercise his seniority, thereby losing his priority in scheduling, which resulted in him having to take on more difficult

assignments. *See Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 449–50 (6th Cir. 2004). The court focused on the scheduling issue, specifically noting that changes in the number of hours of work (i.e., changes in *quantity* of work) could potentially constitute an adverse employment action. *Id.* at 450. It also should be noted that *Johnson* was not decided at the summary judgment stage. *Id.* at 447.

Here, at the summary judgment stage, all justifiable inferences must be drawn in favor of Ms. Irving. *Anderson*, 477 U.S. at 255. In examining the evidence in this fashion, based on the totality of the circumstances, a jury could find that Ms. Irving suffered an adverse employment action. Ms. Irving not only was reassigned to three schools that increased her commuting time, but she was assigned to three schools that resulted in a substantial increase in her workload. It is significant that Ms. Irving is the only SLP to have been assigned these three schools at the same time, and at the summary judgment stage, it is proper to infer even from this fact alone that this is because one person being assigned to these three schools is too much work for one person— and that it would be a discriminatory or retaliatory rebuke to be given this assignment.

These inferences are also borne about by the evidence pertaining to Ms. Irving's workload. Ms. Irving was assigned significantly more students than any other SLP in the district, as well as significantly more than she had previously been assigned. Her caseload in September and October 2015 was more than double that of many of her colleagues. Ms. Irving also had significantly more of the difficult cases (the cases for which she was classified as the "service provider") than many of her colleagues. In fact, she had significantly more cases as a service provider than many of her colleagues had in total.

Although Defendants claim that they tried to ease the burden of Ms. Irving's caseload, when construing the facts in the light most favorable to Ms. Irving, it appears that they did not do

so. The Infinite Campus numbers show no significant change throughout September and October 2015, and Ms. Irving denies that Ms. Bogenrife reduced the numbers in her caseload as Ms. Bogenrife claims to have done.

It is also significant that Ohio has made a judgment that in the ordinary case, no SLP should carry a caseload of more than 80 students. *See* Ohio Admin. Code 3301-51-09(I)(3)(f)(i) (2019) ("A speech and language pathologist shall provide services to no more than: (i) Eighty school-age children with disabilities . . . ."). A school district is not permitted to exceed this maximum without requesting a waiver from the ODE, *id.* 3301-51-09(K), and Defendants have identified no evidence that they sought such a waiver.

In response to this, Defendants argue that 1) Ms. Irving has not presented any evidence that Defendants deliberately assigned her a caseload exceeding the maximum permitted by law, 2) Defendants attempted to reduce the caseload, 3) Ms. Irving was not "the only SLP to ever have a caseload" that exceeded the maximum permitted by law, and 4) Ms. Irving claims to have been able to service her students in spite of her excessive caseload. (ECF No. 52, at 18; ECF No. 64, at 9, 11.) As to the first, the facts construed in the light most favorable to Ms. Irving require precisely this inference, that Defendants' actions were deliberate. As to the second, Ms. Irving disputes that Defendants attempted to reduce her caseload, and she has produced evidence that supports her statements. As to the third, Ms. Irving does not need to prove that no other SLP *ever* had such a large caseload, and the facts support the inference that during the relevant time period, Ms. Irving was indeed the only SLP who did. And as to the fourth, this argument is disingenuous when Defendants themselves have argued, and produced evidence, that Ms. Irving was not completing all of her responsibilities. It is a fair inference from the evidence that Ms. Irving may well have tried to service all of her students (and that she may have even thought that

she had succeeded) but that she was unable to do so. It cannot be the case that an employer can discriminatorily burden an employee with an excessive workload and then fault her for trying to complete all of her work, or even believing (perhaps erroneously) that she had done so.

Because the Court finds that Ms. Irving's transfer, combined with her increased workload, constitutes an adverse employment action, the Court need not address all of the other potentially adverse employment actions that Ms. Irving alleges. However, the Court must address the allegations pertaining to Ms. Hufford's investigation and to the criticisms of Ms. Irving's work by Ms. Carpenter. This is because these are the only allegations pertaining to these two defendants that could potentially provide for a basis for liability. (ECF No. 1, ¶¶ 30, 39–44.). That means that if these allegations do not constitute adverse employment actions, Ms. Hufford and Ms. Carpenter are entitled to summary judgment.

An internal investigation into suspected wrongdoing by an employee does not constitute an adverse employment action. *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006). Nor does the failure to notify an employee that he or she is being investigated. *Id.* As a result, because the allegations as to Ms. Hufford pertain only to her role in the investigation of Ms. Irving, and because Ms. Irving has produced no other evidence of liability on the part of Ms. Hufford, Ms. Hufford's motion for summary judgment is **GRANTED** as to the discrimination component of Claim Two.

Criticism without a "material adverse change in the terms and conditions" of an individual's employment will not constitute an adverse employment action. *Nickell v. Memphis Light, Gas & Water Div.*, 76 F. App'x 87, 93 (6th Cir. 2003). Even a verbal reprimand is not enough for an adverse employment action unless it is something more than "mere criticism." *Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 708 (6th Cir. 2004) (internal quotation marks

omitted). In sum, "[i]f every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999). Thus, because the only allegations as to Ms. Carpenter for which Ms. Irving has provided evidence pertain to Ms. Carpenter's criticisms of Ms. Irving, [2] Ms. Carpenter's motion for summary judgment is **GRANTED** as to the discrimination component of Claim Two.

In the context of the *McDonnell Douglas* burden-shifting framework, Defendants have argued that they had a nondiscriminatory reason for reassigning Ms. Irving. They argue that they reassigned her because of the dysfunctionality of the Darby Woods special education team. (ECF No. 52, at 17.) This explanation is inadequate, and Ms. Irving has provided sufficient evidence to rebut it.

Defendants' innocent explanation does not account for Ms. Irving's increased workload in fall 2015, and the reassignment must be scrutinized in conjunction with this fact. Defendants could have transferred Ms. Irving to a school, or schools, with lighter workloads, or they could have made a meaningful effort to adjust her workload after the transfer. Ms. Irving has produced

---

[2] Ms. Irving makes other allegations against Ms. Carpenter based on her supervisory role, but these claims are not cognizable under § 1983. *Pembaur*, 475 U.S. at 479. Ms. Irving also has made allegations against Ms. Carpenter for which the evidence shows Ms. Carpenter was not responsible, such as the issuance of the letter of direction. (Carpenter Dep. 66:5–8.) Even if Ms. Irving's reassignment can constitute a "material adverse change in the terms and conditions" of her employment, this was not a decision in which Ms. Carpenter had a say. (Carpenter Dep. 36:1–37:3.) Although Ms. Irving claims that Principal Reed said that Ms. Carpenter helped make the decision regarding Ms. Irving's transfer, (Irving Dep. 70:23–71:1), this statement is hearsay and one for which Principal Reed appears to lack personal knowledge. Hearsay evidence should be disregarded when considering summary judgment. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997). This statement is also rebutted by more reliable evidence in that Ms. Carpenter had supervisory responsibility over the District occupational therapists, not the SLPs. (Carpenter Dep. 7:16–9–13.)

sufficient evidence to create an issue of fact that Defendant' proffered reason was not the true reason but that racial animus was.

Finally, as to the fourth element of the *prima facie* case, Ms. Irving has provided evidence that she was "treated differently than a similarly situated, non-protected employee." While Ms. Irving may have been treated the same as Ms. Watson Grace and Ms. Greenwald in terms of being transferred away from Darby Woods, Defendants have not argued that Ms. Watson Grace or Ms. Greenwald experienced the substantial increase in workload that Ms. Irving did. Rather, the evidence shows that once Ms. Irving was transferred, her workload was much heavier than any other SLP in the District.

## ii. Retaliation Claim

To prove a retaliation claim, Ms. Irving must prove that "(1) she engaged in protected activity; (2) her exercise of that activity was known by the Defendant[s]; (3) the Defendant[s] thereafter took an action that was materially adverse to her; and (4) there was a causal connection between the protected activity and the materially adverse action." *Boxill*, 935 F.3d at 520.

Defendants do not dispute that Ms. Irving was engaging in protected activity. (ECF No. 52, at 18–19.) The evidence also indicates that Defendants were aware of this activity, since she told them that she felt that she was being treated differently because of her skin color and the District was notified of the complaints that she had filed with the OCRC. The Court has already determined that there is sufficient evidence to infer that Defendants took an action that was materially adverse to Ms. Irving, and it should be noted that the bar for proving an adverse employment action is lower on a retaliation claim than on a discrimination claim. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63–64 (2006) ("[T]he antiretaliation provision [of

Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

However, as with a discrimination claim, an investigation alone is generally insufficient "to satisfy the materially adverse employment action element" of a retaliation claim. *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 321 (6th Cir. 2013); *see Johnston v. O'Neill*, 130 F. App'x 1, 7 (6th Cir. 2005) ("Mr. Johnston cannot show the terms of his employment changed as a result of the investigation."). "[R]ather it appears the investigation at worst is nothing more than a petty slight, minor annoyance, or simple lack of good manners." *Murphy*, 549 F. App'x at 321.

Ms. Carpenter's alleged criticisms appear to be on a similar plane. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68.

Accordingly, Ms. Hufford's and Ms. Carpenter's motions for summary judgment are **GRANTED** as to the retaliation component of Claim Two.

In the same vein, Ms. Irving has not established any facts that establish an adverse employment action committed by Defendant Carl Metzger. Ms. Irving's allegations against Dr. Metzger pertain only to actions taken by his supervisees or to his actions regarding the report to the ODE, which is relevant only to Claim Three. (ECF No. 1 ¶¶ 30, 45.) As a result, Dr. Metzger's motion for summary judgment is **GRANTED** as to both the discrimination and retaliation components of Claim Two.

As to the fourth element of a retaliation claim, there is sufficient evidence to infer a causal connection between the protected activity and the materially adverse action. The evidence shows that when Ms. Irving had her first meeting with Mr. Carr, on April 9, 2015, the decision to

transfer Ms. Irving was not yet final. First, according to Mr. Carr's testimony, he told Ms. Irving that he was *considering* reassigning her and that she should *consider* where she might want to be reassigned. Second, meetings surrounding this transfer continued for the next several weeks. Third, on May 28, 2015, a letter was issued to Ms. Irving from the District that she was tentatively being assigned to Darby Woods for the 2015–16 school year. In addition, according to Ms. Irving, Mr. Carr told her at this first meeting that she was the only one being transferred.

The second meeting, on May 18, 2015, took place after Ms. Irving told Mr. Carr about her concerns about racial discrimination at the April 9 meeting. At this second meeting, Mr. Carr told Ms. Irving that Ms. Watson Grace and Ms. Greenwald were being transferred as well. It is a fair inference that after Defendants became aware of Ms. Irving's allegation of racial discrimination on April 9, 2015,[3] they decided to retaliate against Ms. Irving.

Furthermore, during summer 2015, before Ms. Irving was assigned her fall caseload, Ms. Irving filed a complaint with the OCRC alleging racial discrimination. Given the close proximity between the filing of this complaint and the assignment of Ms. Irving's fall caseload, it is a fair inference that Defendants retaliated as a result of the OCRC complaint by assigning Ms. Irving an excessive workload in fall 2015.

Based on the above, Defendants' Motion for Summary Judgment as to Claim Two is **DENIED** as to Defendants Steve Carr, Nicole Tyo, and Jennifer Bogenrife.

### c.     Claim One

Claims One and Three both allege First Amendment retaliation. The elements of a First Amendment retaliation claim are: (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from

---

[3] Mr. Carr denies having any knowledge of allegations of racial discrimination until June 2015. (Carr Decl. ¶ 17, ECF No. 52, at 28.) This is a material fact in dispute.

continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by her protected conduct. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). If the plaintiff meets this initial burden, it then falls to the employer to show that it would have reached the same decision even in the absence of the protected speech. *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010). Once the employer presents this evidence, "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.*

Defendants do not argue that Ms. Irving did not engage in constitutionally protected conduct. Rather, Defendants seek summary judgment on Claims One and Three based on the second two elements of a First Amendment retaliation claim: first, they argue that Ms. Irving has not suffered an adverse employment action; and, second, they argue that Ms. Irving cannot establish that the alleged adverse employment actions were motivated by her protected conduct.

The adverse action standard for First Amendment retaliation claims is different from the adverse employment action standard for Title VII claims. *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014). For First Amendment retaliation purposes, an adverse action is one that "'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)). "[I]f a reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising his rights, then the act may not be dismissed at the summary judgment stage." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005).

A court must "'tailor [its] analysis under the adverse action prong to the circumstances of this specific retaliation claim.'" *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (quoting *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005)). For that reason, the Court

must consider the alleged adverse actions to determine whether Ms. Irving has "produced evidence from which a reasonable jury could conclude that the action 'might have dissuaded a reasonable worker' from engaging in protected activity." *See Benison*, 765 F.3d at 659 (quoting *Burlington*, 548 U.S. at 68).

In seeking to establish an adverse action under Claim One, Ms. Irving relies on the same actions previously discussed. (ECF No. 61, at 31–32). As a result, the Court begins by applying this lower standard to Ms. Irving's reassignment. The Sixth Circuit has recognized that a teacher's involuntary transfer to another school within the district "would have a sufficient chilling effect to qualify as an adverse action under the First Amendment retaliation analysis." *Leary v. Daeschner*, 228 F.3d 729, 738 (6th Cir. 2000).

Here, Ms. Irving claims that being assigned to three schools makes it harder to develop long-term relationships with other professional staff members and results in significant lost time for servicing students because of her travel among the schools. (ECF No. 59-1, ¶¶ 4-5.) This is the kind of impact that would chill a person of ordinary firmness from engaging in constitutionally protected activity because it can negatively impact a person's "daily experiences including [her] commute, coworker friendships, and community relationships." *See Leary v. Daeschner*, 349 F.3d 888, 901 (6th Cir. 2003). It follows that an increase in workload would have a similar negative impact on a person and would have an equally chilling effect on that person's First Amendment rights, especially in conjunction with a retaliatory transfer.

Because the Court finds that Ms. Irving's transfer and her increased workload constitute an adverse action, the Court need not address all other potential adverse actions that Ms. Irving alleges. However, as with Claim Two, the Court must address the allegations pertaining to Ms. Hufford's investigation and to the criticisms of Ms. Irving's work by Ms. Carpenter.

The Sixth Circuit has previously concluded that an investigation into suspected wrongdoing is not an adverse employment action where the person being investigated is suspended with full pay and benefits. *Harris v. Detroit Pub. Sch.*, 245 F. App'x 437, 443 (6th Cir. 2007). Thus, it follows that an investigation where there is no suspension, as here, also would not constitute an adverse employment action.

While "the harassment necessary to rise to a level sufficient to deter an individual is 'not extreme . . . the plaintiff must still establish some relatively strong action." *Perkins v. Twp. of Clayton*, 411 F. App'x 810, 814 (6th Cir. 2011) (internal quotation marks omitted). In addition, "[t]he objective inquiry into whether the actions taken against an individual rise to the level of an adverse action is highly dependent on context . . . ." *Id.*

The Court does not view the criticisms that Ms. Irving alleges Ms. Carpenter made as being so severe that they would chill or silence a person from exercising his/her First Amendment rights. Notably, the Sixth Circuit has found that similar plaintiffs subjected to similar criticisms did not suffer an adverse action. *See, e.g.*, *Fritz v. Charter Twp. of Comstock*, 463 F. App'x 493, 498–500 (6th Cir. 2012) (declining to find that criticisms against plaintiff were sufficiently "embarrass[ing], humiliat[ing, or] emotional[ly] distress[ing]" to constitute adverse actions); *Mezibov*, 411 F.3d at 722–23 (holding that statements that defense lawyer was a bad attorney, was inexperienced, and was acting in his own self interest did not "exact a harm . . . that would deter an ordinary criminal defense attorney from vigorously representing his clients"); *cf. Mattox v. City of Forest Park*, 183 F.3d 515, 522–23 (6th Cir. 1999) (finding that publication of volunteer firefighter's personal information in investigative report was not sufficiently embarrassing to constitute adverse action). Ms. Irving has established insufficient facts to demonstrate that these criticisms rose to the level of an adverse action.

Because the actions alleged to have been committed by Ms. Hufford and Ms. Carpenter do not constitute adverse actions, Ms. Hufford's and Ms. Carpenter's motions for summary judgment are **GRANTED** as to Claim One.

As with Claim Two, Ms. Irving has not established any facts that establish any adverse actions committed by Defendant Carl Metzger that could provide for liability under Claim One. As a result, Dr. Metzger's motion for summary judgment is **GRANTED** as to Claim One.

The next step in the inquiry is to consider whether Ms. Irving's speech motivated the adverse action. To prove this, Ms. Irving must establish "'that the speech at issue represented a *substantial* or *motivating* factor in the adverse employment action.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir.2010) (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). The Sixth Circuit has interpreted "motivating factor" to mean the but-for cause, "'without which the action being challenged simply would not have been taken.'" *Id.* (quoting *Leonard v. Robinson,* 477 F.3d 347, 355 (6th Cir.2007)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977) ("The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct.").

To establish that the protected speech motivated the adverse action, a plaintiff must "'point to specific, nonconclusory allegations reasonably linking her speech to the employer discipline.'" *Rodgers*, 344 F.3d 587, 602 (6th Cir. 2003) (quoting *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002)). Mere speculation, innuendo and rumor are insufficient to substantiate a First Amendment retaliation claim. *Buchko v. Cty. of Monroe*, 506 F. App'x 400, 405–06 (6th Cir. 2012); *see also Vereecke*, 609 F.3d at 399–400 ("When assessing motive in the context of a summary judgment motion, '[b]are allegations of malice [do] not

suffice to establish a constitutional claim.'" (second alteration in original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))).

While causation is usually a question to be resolved by a jury, "a court may grant summary judgment on the issue of causation when there is no genuine issue of material fact from which a reasonable jury could conclude that the employee's discharge was motivated in part by her speech." *Burgess v. Paducah Area Transit Auth.,* 387 F. App'x 538, 545 (6th Cir. 2010). In conducting this analysis, a court must look at the totality of the circumstances. *Vereecke*, 609 F.3d at 401. "[E]xtremely close temporal proximity" alone is enough to permit an inference of retaliatory motive, but when the temporal connection is more remote, additional evidence is required. *Id.*

In this case, there is sufficient evidence to infer a causal connection between the protected activity and the adverse action, not only based on timing, but also based on other evidence. As was explained in the context of the racial retaliation claim, Ms. Irving contends that she told Mr. Carr in their April 9, 2015, meeting about her concerns about overqualification. Although Ms. Irving had previously shared these concerns with Ms. Spence, there is no evidence that Ms. Spence told anyone or took any action. As a result, construing the evidence in the light most favorable to Ms. Irving, it is reasonable to infer that this is the first time any of Defendants learned that Ms. Irving had these concerns.

According to Ms. Irving, Mr. Carr told her that she was the only person he was thinking about transferring. This is important for two reasons. First, although Mr. Carr was already considering transferring Ms. Irving, her reassignment was not set in stone. Rather, she was not actually reassigned until after she raised her concerns about overqualification. Second, at their second meeting, on May 18, 2015, Mr. Carr told Ms. Irving that Ms. Watson Grace and Ms.

Greenwald were being transferred as well. This evidence permits the inference that after Defendants became aware of Ms. Irving's allegation of overqualification on April 9, 2015, they decided to transfer two other members of the team in order to protect their decision from allegations of retaliation.

Furthermore, during summer 2015, before Ms. Irving was assigned her fall workload, Ms. Irving filed a complaint with the OCRC in which she raised her concerns about overqualification. Based on the evidence that Ms. Irving was the only SLP to receive such a disproportionate workload in fall 2015, it is a fair inference that Defendants retaliated as a result of the OCRC complaint by assigning Ms. Irving an excessive workload in fall 2015.

Lastly, it is fair to infer from the evidence that after Ms. Irving complained to OBSLPA that her caseload exceeded the amount permitted under state law, the Defendants retaliated against her by maintaining her excessive caseload and workload. It is significant that Ms. Irving received a response from OBSLPA on September 23, 2015, and on September 24, 2015, Ms. Bogenrife gave Ms. Irving the Letter of Direction. Whether or not the Letter of Direction itself was an adverse action is immaterial. Rather, this is evidence of animus by Ms. Bogenrife in response to Ms. Irving's protected complaint. And at the summary judgment stage, it is reasonable to infer that this animus is evidence of a retaliatory motive in assigning and maintaining Ms. Irving's excessive workload.

The motion for summary judgment on Claim One as to Defendants Steve Carr, Nicole Tyo, and Jennifer Bogenrife is **DENIED**.

### d.      Claim Three

In Claim Three, Ms. Irving has alleged post-termination First Amendment retaliation based on Defendants' report to the ODE. (ECF No. 1 ¶ 61.) As with Claim Two, in order to

sustain this claim, Ms. Irving must prove that Defendants' retaliatory motive was the "but-for" cause of the filing of the Misconduct Form. She cannot meet this standard.

Pursuant to Ohio law, the superintendent of a school district must report to the ODE any licensed district employee who resigns "because of or in the course of an investigation by the board of education . . . regarding whether the employee has committed an act that is unbecoming to the teaching profession . . . ." Ohio Rev. Code Ann. § 3319.313(B)(4) (West 2019). Although Ms. Irving disputes many aspects of this investigation (e.g., whether it was justified, whether it was properly conducted, and whether she committed the infractions alleged), she does not dispute that there was indeed an investigation that occurred. (ECF No. 61, at 2.)

Ms. Irving argues that the investigation concluded with the completion of Ms. Hufford's report, presumably to support the argument that Ms. Irving resigned after the investigation had already concluded, rather than "in the course" of it. (*Id.* at 18.) This argument does not stand up to scrutiny. Rightfully or wrongfully, Ms. Hufford's report validated some of the claims of wrongdoing against Ms. Irving, including the allegations of fraud. Concluding the investigation at that point would have defeated the purpose of having the investigation at all. The evidence demonstrates that the District believed that it had uncovered fraud. There is no doubt that the investigation did not conclude with the completion of the report or that Ms. Irving resigned "in the course of" the investigation. Ultimately, Ms. Irving acknowledges that the completion of the report did not conclude the investigation—and that she may well *still* be under investigation. (*Id.* at 21.)

Because Ms. Irving was still under investigation at the time of her separation, the District was legally required to file the Misconduct Form with the ODE. Mr. Metzger has stated that he submitted the Misconduct Form based on the advice of District legal counsel and the ODE, in

order to comply with Ohio law. Ms. Irving has not provided adequate evidence to be able to rebut this. She therefore cannot establish that Defendants had a retaliatory motive in reporting her resignation to the ODE and that that motive was a "but-for" cause for the submission of the Misconduct Form.

Because Ms. Irving cannot prove that a retaliatory motive on the part of Defendants was a "but-for" cause for the filing of the Misconduct Form, this claim fails, and the Court need not address the other elements of the claim. Defendants' Motion for Summary Judgment as to Claim Three is **GRANTED**.

### e. Plaintiff's Request for Punitive Damages

Finally, Defendants seek summary judgment on Ms. Irving's demand for punitive damages. Because Defendants Deborah Carpenter, Carl Metzger, Amber Hufford, and William Wise are entitled to summary judgment on all claims, they are entitled to summary judgment on the claim for punitive damages as well.

In light of the discussion above, the only remaining claims against Defendants Steve Carr, Nicole Tyo, and Jennifer Bogenrife are for race retaliation under §§ 1981–1983 and race discrimination under § 1983, both pleaded under Claim Two, and Claim One for First Amendment retaliation.

To recover punitive damages in an employment discrimination case, a plaintiff must demonstrate that her employer engaged in a discriminatory practice "with malice or with reckless indifference to the [plaintiff's] federally protected rights . . . ." 42 U.S.C. § 1981a(b)(1). "Malice" and "reckless indifference" under the statute refer to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). That is, "in the context of § 1981a, an employer

must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536. Ms. Irving has offered no evidence that Defendants acted with any awareness of knowledge that that they might have been acting in violation of federal law. Accordingly, Defendants are entitled to summary judgment on Ms. Irving's claims for punitive damages as to Claim Two.

However, the circumstances are different for Claim One. Retaliation on the basis of the exercise of First Amendment rights necessarily requires that the defendant act "with the purpose of infringing upon the plaintiff's federally protected rights." *King v. Zamira*, 788 F.3d 207, 216 (6th Cir. 2015). As a result, "a defendant who has been found liable for First Amendment retaliation has engaged in conduct that warrants consideration of an award of punitive damages." *Id.* at 216–17. Because Defendants Steve Carr, Nicole Tyo, and Jennifer Bogenrife are not entitled to summary judgment on Ms. Irving's First Amendment retaliation claim under Claim One, they are also not entitled to summary judgment as to punitive damages regarding Claim One.

III. **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Judgment on the Pleadings as to Claims Four, Five, and Six is **GRANTED**. Defendants' Motion for Judgment on the Pleadings as to Claim Two is **DENIED.**

Defendants' Motion for Summary Judgment as to Claim Three is **GRANTED**. Defendants' Motion for Summary Judgment as to Claims One and Two are **DENIED** as to Defendants Steve Carr, Nicole Tyo, and Jennifer Bogenrife and are **GRANTED** as to Defendants Deborah Carpenter, Carl Metzger, Amber Hufford, and William Wise.

Defendants' Motion for Summary Judgment as to the claim for punitive damages is

**GRANTED** in its entirety with respect to Defendants Deborah Carpenter, Carl Metzger, Amber Hufford, and William Wise. With respect to Defendants Steve Carr, Nicole Tyo, and Jennifer Bogenrife, their Motion for Summary Judgment as to the claim for punitive damages is **GRANTED** as to Claim Two and **DENIED** as to Claim One.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**